LEAR, Judge.
This is an appeal from a judgment rejecting demands by plaintiff individually for certain medical and hospital bills and as administrator of the estate of his uneman-cipated minor son for personal injuries resulting from an intersectional collision in the City of Opelousas.
Julia Street is a hard-surfaced street approximately 26 feet wide, running east and west through a residential area in Opelousas.
Virginia Street, also hard-surfaced, runs generally north and south, intersecting and traversing Julia Street. However, at that intersection there is an offset to the west for vehicular traffic moving north on Virginia Street. That is, at the intersection where Virginia Street enters the south side of Julia Street, a motorist intending to proceed north on Virginia Street must turn west, or to his left, in order to re-enter Virginia Street at the north boundary of the intersection with Julia Street.
There is a water valve cover situated on the midline of Julia Street in the middle of *595 the intersection. That is, the water valve cover is almost immediately north of the continuation of the western curb line of the southern leg of Virginia Street and almost immediately south of the eastern curb line of the northern leg of Virginia Street. Julia Street is the favored street, there being a stop sign on the northeast corner of Virginia Street commanding traffic approaching Julia Street from the south to come to a stop before entering or attempting to traverse the intersection. This stop sign is some 22 feet south of the southern curb line of Julia Street. It was established that the speed limit for traffic in this area of Opelousas was 25 mph.
On September 12, 1964, Kerry De-mouchet, the minor son of plaintiff, was operating a Honda motorcycle north on Virginia Street. At this time, Kerry was sixteen years of age and had as a passenger on his motorcycle a fourteen-year-old female named Janet Gordon.
At that time, Louis A. Doucet, a deputy sheriff of St. Landry Parish, acting within the course and scope of his employment, was operating a vehicle east on Julia Street. Riding with him as his guest passenger was Clarence Snyder, his brother-in-law.
The front of the Doucet automobile struck the left side of the motorcycle immediately over the water valve cover described above, causing severe injuries to both Kerry Demouchet and Janet Gordon. Louis A. Doucet, the Sheriff of St. Landry Parish, his employer, and the liability insurer of the automobile were joined as parties defendant in this matter.
In addition to the usual allegations of negligence by failure to keep a proper lookout and failure to keep the vehicle under proper control, the petition charges Louis A. Doucet with negligence in exceeding the speed limits set by the city ordinance of the City of Opelousas, and in operating a motor vehicle which was inherently unsafe and unsuited for normal vehicular traffic upon the city streets.
For reasons not necessary to expound upon here, Louis Doucet was not driving the automobile regularly assigned to him by the sheriff’s office, but was operating his personal car. This was a 1931 Ford Coupe in which had been installed a 1956 Chevrolet engine and a 1956 Chevrolet rear end. It was equipped with hyraulic brakes, but only on the rear axle. It was admitted that the speedometer was not operating nor was the horn operating normally from the steering wheel button. This automobile was classified by petitioner as a “hot rod" used for racing purposes. Mr. Doucet denied that this vehicle could properly be classified as a “hot rod”, and denied that the car was suitable to or had ever been used for racing purposes. He stated that this was merely a sports car rebuilt by him as a hobby, and although it was capable of speeds of 110 mph on a good, straight road, he denied ever having driven it that fast or for the purposes of speed alone.
Immediately prior to the accident, it seems uncontroverted that young Kerry Demouchet, proceeding north on Virginia Street towards the intersection of Julia Street, brought his motorcycle to a complete stop almost even with the stop sign on Virginia Street. After holding a short conversation with his passenger as to their destination and deciding to proceed north on Virginia across Julia, he rolled his motorcycle forward two or three feet and brought it to a complete stop for the second time. He states that he looked both ways on Julia and, not seeing an approaching vehicle, proceeded into the intersection. He and his passenger both testified that neither saw the Doucet vehicle until immediately prior to the collision.
Mr. Doucet testified that he was driving about 30 or 35 miles an hour east on Julia Street. He stated that when he reached a point about 15 or 20 feet west of the intersection, the motorcycle entered Julia Street from the south and that he applied his brakes and veered. to his left in an attempt to keep from hitting it.
*596 After the impact, the motorcycle was jammed under the left front fender of the vehicle and was dragged along the roadway with the car until both came to a stop on the north side of Julia Street east of the intersection.
Officer Joseph McClelland of the Ope-lousas police force testified that he was called to the scene of the accident and there conducted an investigation. He stated that due to the dry condition of the hard-surfaced roadway, he was able to determine that the point of impact was immediately over the aforementioned water valve cover. He further stated that the automobile had left skidmarks commencing about 12 feet west of the valve cover and proceeding in an east-northeast direction for a total distance of approximately 75 feet.
On the northeast corner of this intersection was a board fence. A bottom board of this fence was broken and a board across the top of one section of the fence was knocked loose at one end. Plaintiff makes much of the fact, as he analyzes it, that this fence stopped the forward motion of the automobile and hence that the distance travelled by the automobile after impact was not a true indication of its speed at the moment of impact. However, we find, as Officer McClelland and Mr. Doucet both testified, that the damage to the fence was caused by the motorcycle striking the bottom of the fence and that the automobile itself did not come into contact therewith.
Plaintiff adduced two witnesses, Grace Fountain, and her son-in-law, James Dixon, who both testified that they were in the Fountain home approximately three and one-half blocks west of the scene of the accident, that they saw the Doucet car and saw that it was travelling at a very high rate of speed east on Julia Street. However, analyzing the testimony of these two persons, we feel that they are sincerely mistaken in their conclusions and feel that the noise made by the straight exhaust of this sports model car was misleading and gave an impression of speed that actually was not being travelled. We feel that the physical evidence surrounding the accident as a whole bears out Mr. Doucet’s testimony that he was travelling at about 30 to 35 miles an hour. This, of course, is an admission in itself that he was exceeding the legal speed limit and constitutes a very important factor to be considered by this court.
Mr. Clarence Snyder corroborates the testimony and evidence as to the speed of the Doucet vehicle. He stated in essence that he saw the motorcycle about 15 or 20 feet south of the intersection at a time when the Doucet car was between 30 and 50 feet west of the intersection. His testimony, in substance, was that when he noticed the motorcycle entering the intersection, he yelled “Look out! Look out!” and that Mr. Doucet immediately applied his brakes and swerved to his left in an attempt to take sufficient evasive action to avoid the collision.
After hearing the above evidence, and much more, adduced before it, the trial court, without written reasons, gave judgment for defendants dismissing the plaintiff’s causes of action.
This factual situation again presents to the court those troublesome problems relating to the duties of motorists approaching street intersections. Some of these principles are well established, such as the obligation of the vehicle on the inferior street to come to a complete stop before entering the intersection, and to accord traffic on the superior thoroughfare the right of way.
On the other hand, the motorist on the superior roadway cannot disregard ordinary rules of safety or operate his vehicle in complete disregard of the rights and safety of others. He must be alert and keep a proper lookout and if he sees another in an attitude of danger, either present or imminent, he must take whatever evasive, defensive action necessary for the avoidance of the collision.
*597 However, in balancing- these conflicting liabilities, the courts have been required to notice the tremendous increase of vehicular traffic on our city streets and the consequent increase of danger unless strict compliance with traffic regulations is had. As stated by Justice McCaleb in his concurring opinion in Randall v. Baton Rouge Bus Co., 240 La. 527, 124 So.2d 535, the courts have given increased recognition to the right of the motorist travelling on right-of-way streets to indulge in the assumption that traffic approaching intersections from less favored streets will observe the law.
As stated by Judge Hood in Fontenot v. Liberty Mutual Ins. Co., La.App., 130 So.2d 462:
“When confronted with a stop sign erected by municipal authorities, in addition to being legally obligated to bring his vehicle to a complete stop, a motorist is held to the duty of carefully appraising traffic conditions at intersecting streets and of assuring himself that the way is clear to make safe passage across the intersection before he enters it. (citing case)”
We feel that young Kerry Demouchet did not fulfill this legal obligation. Though he and his passenger testified that they could see to the west on Julia Street for a distance in excess of 100 feet, the photographic evidence introduced in this matter shows that their vision was hampered by the presence of ornamental bushes, hedges and a telephone pole along the south curb line of Julia Street. Furthermore, though Mr. Doucet admits that he was exceeding the legal speed limit, his excessive speed was not such that proper observation by young Demouchet would not have revealed that the Doucet car was in such close proximity to the intersection that to enter the intersection would have placed himself and his passenger in grave peril. This is necessarily true inasmuch as Kerry’s entrance into the intersection of necessity had to be made at an angle to the northwest, which would have required his presence in the intersection for a longer period of time than if he could have proceeded straight across Julia Street.
 Though the violation of a speed limit may be negligence per se, excessive speed is not always a proximate or contributing cause of an accident. This court feels that Mr. Doucet’s speed in the instant case was of this nature. The evidence, we think, clearly shows that the contributory negligence of plaintiff’s minor son is sufficient to deny him recovery in this case.
Though it may be incongruous for a deputy sheriff to perform his official functions in a homemade sports model car, the evidence convinces us that the nature and character of this vehicle offered no contribution whatsoever to the accident.
For the reasons above assigned, the judgment of the district court is affirmed.
Affirmed.